| | | |
|---|---|---|
| **CHRISTOPHER JONES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 2:11CV62SNLJ/MLM** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of Michael J. Astrue ("Defendant") denying the application of Plaintiff Christopher Jones ("Plaintiff") for Social Security disability benefits under Title II of the Social Security Act, 42 U.S.C. § § 401 et seq., and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § § 1381 et seq. Plaintiff has filed a brief in support of the Complaint. Doc. 13. Defendant has filed a brief in support of the Answer. Doc.14. This matter was referred to the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(b)(1). Doc. 5.

## I.
## PROCEDURAL HISTORY

Plaintiff filed applications for benefits[1] and his applications were denied on February 24, 2009. Tr. 55-56, 103-112. Plaintiff requested for a hearing before an Administrative Law Judge ("ALJ"), which was held on April 15, 2010. Tr. 29-54. By decision, dated June 25, 2010, the ALJ found Plaintiff not disabled through the date of the decision. Tr. 8-27. On July 1, 2011, the Appeals Council

---

[1]      Plaintiff alleged a disability onset date of December 18, 2007, in both of his applications. At the hearing before the Administrative Law Judge, he amended his onset date to June 16, 2008, the date he was released from prison. Tr. 33.

denied Plaintiff's request for review. Tr. 1- 6. As such, the decision of the ALJ stands as the final decision of the Commissioner.

## II.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001) (citing Nguyen v. Chater, 75 F.3d 429, 430-31 (8th Cir. 1996))).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); pt. 404, subpt. P, app. 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id.

Fourth, the impairment must prevent the claimant from doing past relevant work. 20 C.F.R. §§ 416.920(f), 404.1520(f). The burden rests with the claimant at this fourth step to establish his or her Residual Functional Capacity ("RFC"). Steed v. Astrue, 524 F.3d 872, 874 n.3 (8th Cir. 2008) ("Through step four of this analysis, the claimant has the burden of showing that she is disabled."); Eichelberger, 390 F.3d at 590-91; Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); Young v. Apfel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f).

Fifth, the severe impairment must prevent the claimant from doing any other work. 20 C.F.R. §§ 416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to produce evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC. Steed, 524 F.3d at 874 n.3; Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id. See also Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC.").

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v.

*Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002). See also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). In Bland v. Bowen, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

See also Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) ("[W]e may not reverse merely because substantial evidence exists for the opposite decision.") (quoting Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)); Hartfield v. Barnhart, 384 F.3d 986, 988 (8th Cir. 2004) ("[R]eview of the Commissioner's final decision is deferential.").

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. Cox, 495 F.3d at 617; Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1993); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence"). Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022. See also Eichelberger, 390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell

4

v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) Findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

Additionally, an ALJ's decision must comply "with the relevant legal requirements." Ford v. Astrue, 518 F.3d 979, 981 (8th Cir. 2008).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be

produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of

pain, the ALJ must consider:

> (1) the claimant's daily activities;

> (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;

> (3) any precipitating or aggravating factors;

> (4) the dosage, effectiveness, and side effects of any medication; and

> (5) the claimant's functional restrictions.

Baker v. Sec'y of Health & Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at

1322. The absence of objective medical evidence is just one factor to be considered in evaluating the

plaintiff's credibility. Id. The ALJ must also consider the plaintiff's prior work record, observations

by third parties and treating and examining doctors, as well as the plaintiff's appearance and

demeanor at the hearing. Polaski, 739 F.2d at 1322; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the

record which cause him to reject the plaintiff's complaints. Guilliams, 393 F.3d at 801; Masterson,

363 F.3d at 738; Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003); Hall v. Chater, 62 F.3d 220,

223 (8th Cir. 1995). It is not enough that the record contains inconsistencies; the ALJ must

specifically demonstrate that he considered all of the evidence. Robinson v. Sullivan, 956 F.2d 836,

841 (8th Cir. 1992); Butler v. Sec'y of Health & Human Servs., 850 F.2d 425, 429 (8th Cir. 1988).

The ALJ, however, "need not explicitly discuss each Polaski factor." Strongson v. Barnhart, 361 F.3d

1066, 1072 (8th Cir. 2004). See also Steed, 524 F.3d at 876 (citing Lowe v. Apfel, 226 F.3d 969,

972 (8th Cir. 2000)). The ALJ need only acknowledge and consider those factors. Id. Although

credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment

must be based on substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a)(1), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy. Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006); Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-47 (8th Cir. 1982) (en banc)). The Commissioner must first prove that the claimant retains the RFC to perform other kinds of work. Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857. The Commissioner has to prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983). Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert ("VE") may be used. An ALJ posing a hypothetical to a VE is not required to include all of a plaintiff's limitations, but only those which he finds credible. Goff, 421 F.3d at 794 ("[T]he ALJ properly included only those limitations supported by the record as a whole in the hypothetical."); Rautio, 862 F.2d at 180. Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons. Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006); Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell v. Sullivan, 892 F.2d 747, 750 (8th Cir. 1989).

# III.
## DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. Onstead, 962 F.2d at 804. Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm his decision as long as there is substantial evidence in favor of the Commissioner's position. Cox, 495 F.3d at 617; Krogmeier, 294 F.3d at 1022.

Plaintiff testified that, at the time of the hearing, he was thirty years old, single, and the father of three children, ages ten, three, and one; that he was six feet tall and weighed 350 pounds; that he had no income and received food stamps; and that he lived in a house with his girlfriend, her mother, and their young daughter. Tr. 33-36. Plaintiff further testified that he had been in prison for possession of a controlled substance; that he had a twelfth grade education; that he last worked, in 2007, in construction; that he also had worked as a truck bay attendant, a laborer at a warehouse, a pizza delivery driver, and an assistant manager at a pizza restaurant; that he had been clean and sober for four or five years; and that his disabling conditions included mental health problems, problems with both of his knees, diabetes, hypertension, headaches due to hypertension, and wrist problems. Tr. 36-38, 42-43.

The ALJ found that Plaintiff had not engaged in substantial gainful activity since June 16, 2008, his alleged onset date; that he had the severe impairments of bipolar disorder, obesity, diabetes, left knee meniscal tear, status-post tendon release of the right wrist, and hypertension; that Plaintiff did not have an impairment or combination of impairments which met or equaled the severity of one of the impairments listed in the Regulations; that Plaintiff had the RFC to perform medium work with certain additional limitations; that the intensity, persistence, and limiting effects of Plaintiff's symptoms were not credible to the extent they were inconsistent with his RFC; that, based on the

testimony of a VE, Plaintiff was able to perform his past relevant work as a bay attendant, laborer in a warehouse, and automobile detailer; and that, therefore, Plaintiff was not disabled through the date of the decision.

Plaintiff contends that the ALJ's decision is not supported by substantial evidence because the ALJ erred in finding that Plaintiff's mental impairment did not meet a listing of impairment under § 12.04; because the ALJ did not adopt the opinion of Plaintiff's treating mental health professional, Corrie Willis, RNBC, AP/MHCNS, regarding the severity of Plaintiff's condition; and because the ALJ erred when she found that Plaintiff could perform past relevant work or any work in the national economy.

A.      **Plaintiff's Credibility:**

The court will first consider the ALJ's credibility determination, as the ALJ's evaluation of Plaintiff's credibility was essential to the ALJ's determination of other issues, including the severity of Plaintiff's conditions and whether he could perform past relevant work. See Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010) ("[The plaintiff] fails to recognize that the ALJ's determination regarding her RFC was influenced by his determination that her allegations were not credible.") (citing Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005)); 20 C.F.R. §§ 404.1545, 416.945 (2010).  As set forth more fully above, the ALJ's credibility findings should be affirmed if they are supported by substantial evidence on the record as a whole; a court cannot substitute its judgment for that of the ALJ. Guilliams, 393 F.3d at 801; Hutsell, 892 F.2d at 750; Benskin, 830 F.2d at 882. To the extent that the ALJ did not specifically cite Polaski, case law, and/or Regulations relevant to a consideration of Plaintiff's credibility, this is not necessarily a basis to set aside an ALJ's decision where the decision is supported by substantial evidence. Randolph v. Barnhart, 386 F.3d 835, 842 (8th Cir. 2004); Wheeler v. Apfel, 224 F.3d 891, 895 n.3 (8th Cir. 2000); Reynolds v. Chater, 82

F.3d 254, 258 (8th Cir. 1996); Montgomery v. Chater, 69 F.3d 273, 275 (8th Cir. 1995). Additionally, an ALJ need not methodically discuss each Polaski factor if the factors are acknowledged and examined prior to making a credibility determination; where adequately explained and supported, credibility findings are for the ALJ to make. See Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000). See also Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each Polaski factor as long as the analytical framework is recognized and considered."); Strongson, 361 F.3d at 1072; Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996). In any case, "[t]he credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003). See also Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010); Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006). For the following reasons, the court finds that the reasons offered by the ALJ in support of his credibility determination are based on substantial evidence.

First, the ALJ considered the inconsistencies between Plaintiff's allegations and the objective medical evidence. A lack of objective medical evidence is a factor an ALJ may consider in determining a claimant's credibility. Forte v. Barnhart, 377 F.3d 892, 895 (8th Cir. 2004). Indeed, although an ALJ may not disregard a claimant's subjective allegations because they are not fully supported by objective medical evidence, an ALJ may properly discount subjective complaints if inconsistencies exist in the record as a whole. Gonzalez v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006) (citing Ramirez v. Barnhart, 292 F.3d 576, 581 (8th cir. 2002)); 20 C.F.R. § § 404.1529(c), 416.929(c). In regard to Plaintiff's alleged mental impairments, James L. Tichenor, Ph.D., evaluated Plaintiff on February 3, 2009, and reported that Plaintiff had appropriate hygiene; that he was alert

"but withdrawn"; that his speech quantity was low average with no articulation difficulty; that he was oriented to person, place, and time "but he missed the date by one day"; that his thought process was logical and coherent; that he denied hallucinations including paranoia; that his mood was depressed and his affect was "quite labile with occasional tearing"; that his insight and judgment appeared satisfactory enough for him to manage money and his affairs; that he denied suicidal ideation "but reported some current ideation but no plans or intent"; that Plaintiff said he had "'walked off' of every job he had due to his emotions got out of control"; that Plaintiff had moderate depressive symptoms; that Plaintiff's ability to understand and remember instructions, sustain concentration and persist in tasks, and interact socially and adapt were "quite deficit" and "would likely preclude gainful employment." Dr. Tichenor opined that "with appropriate medications, [Plaintiff's] functional capacity [was] likely to improve sufficiently as to make employment possible. He does appear capable of managing money independently." Dr. Tichenor further opined that Plaintiff had a Global Assessment of Functioning ("GAF") of 55.[2] Tr. 203-205.

---

[2]     Global assessment of functioning ("GAF") is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. See Diagnostic and Statistical Manual of Mental Disorders, DSM-IV, 30-32 (4th ed. 1994). Expressed in terms of degree of severity of symptoms or functional impairment, GAF scores of 31 to 40 represent "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood," 41 to 50 represents "serious," scores of 51 to 60 represent "moderate," scores of 61 to 70 represent "mild," and scores of 90 or higher represent absent or minimal symptoms of impairment. Id. at 32. See also Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010) ("[A] GAF score of 65 [or 70] ... reflects 'some mild symptoms (e.g. depressed mood or mild insomnia) OR some difficulty in social, occupational, or school functioning ... but generally functioning pretty well, has some meaningful interpersonal relationships.' " (quoting Kohler v. Astrue, 546 F.3d 260, 263 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000)) (alterations in original).

Although "the Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' ... GAF scores may still be used to assist the ALJ in assessing the level of a claimant's functioning." Halverson v. Astrue, 600 F.3d 922, 930-31 (8th Cir. 2010) (quoting 65 Fed. Reg. 50746, 50764-65, 2000 WL 1173632 (Aug. 21, 2000), and

Nurse Willis, of Preferred Family Healthcare, performed an initial evaluation of Plaintiff on April 6, 2009. Nurse Willis's April 2009 report states that Plaintiff said his last physical was in December 2007 when he entered prison; that he had been hospitalized once when he tore his meniscus and had to have surgery on his right knee; that he continued to have right knee pain; and that he had trouble with back pain and pain in his lower back and shoulder blades. Tr. 316. A Progress Note completed by Nurse Willis on July 20, 2009, states that Plaintiff was cooperative; that his motor activity was spontaneous; that his mood was depressed and angry; that his speech was normal; that his thought was organized; that he did not have homicidal ideations or hallucinations; that he was self-aware; that his impulse control was poor; that he was anxious; that she recommended Plaintiff see a clinical social worker ("CSW") weekly; and that Plaintiff had not seen his CSW "for [the] last 6 weeks." Tr. 310. On August 17, 2009, Nurse Willis completed a Medical Source Statement of Ability to do Work-Related Activities (Mental), in which she opined that Plaintiff had no restrictions in regard to understanding and remembering simple instructions, carrying out simple instructions, and the ability to make judgments on simple work-related decisions; that he had marked limitations in regard to interacting appropriately with the public, supervisors, and co-workers; that he had an extreme limitation in regard to responding appropriately to usual work situations and to changes in routine work settings; that his mood fluctuated with and without stressors; that Plaintiff lost time with blackouts; that he was distracted easily; that he had "agitated outbursts"; and that Plaintiff was disabled as of December 15, 2007. Tr. 231-32. On August 17, 2009, Nurse Willis reported that Plaintiff had appropriate goals, poor impulse control, low mood, lost his temper, and was easily annoyed. She also noted on this date "better medical issues." Tr. 309. Nurse Willis's

citing (Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002) ("While a GAF score may be of considerable help to the ALJ in formulating the [residual functional capacity], it is not essential to the RFC's accuracy.")).

September 14, 2009 notes indicate that Plaintiff had poor impulse control; that he was self-aware; that his attitude was cooperative; that his judgment was impaired; and that his thought process was paranoid. Tr. 308. Nurse Willis noted on September 16, 2009, that Plaintiff was "*better at times*." Tr. 308. On September 28, 2009, Nurse Willis reported that Plaintiff said he was "*pretty good today*" and that he was "not flipping out." She also reported on this date that Plaintiff's impulse control was poor and that his judgment was good. Tr. 307. On October 12, 2009, Nurse Willis reported that Plaintiff said his "*mood* [had] been *pretty good*"; that Plaintiff's affect was appropriate; that his thought was organized; that his *impulse control* was "*better*"; that his process of thinking was "org"; and that he was alert. Tr. 306. On October 26, 2009, Nurse Willis reported that Plaintiff said he had been "really stressed" and had "to find a place to stay" and that he had "been trying to get custody." On this date his mood was depressed, his speech was normal, and his thought was organized; he was alert; and his impulse control and judgment were good. Tr. 305. On November 9, 2009, Nurse Willis reported that Plaintiff's impulse control and judgment were good. Tr. 304. On November 23, 2009, Nurse Willis noted that Plaintiff reported that his "social security [was] slow." She also reported that Plaintiff's judgment and impulse control were good and that Plaintiff said he was "*doing better* [with his] bipolar [disorder]." Tr. 303. On December 14, 2009, Nurse Willis reported that Plaintiff said he was *stable*; that he was not "flipping out" or "blacking out"; and that he was unable to get housing, disability, or work. Tr. 302.

Nurse Willis reported on January 11, 2010, that Plaintiff was *exercising three times a week*; that he was doing well with his diet and exercise; that his impulse control and judgment were good; that he was self-aware; and that his anxiety/worrying, "low mood," loss of temper, and "blaming" were "better." Tr. 301. On January 20, 2010, Nurse Willis noted "better - making changes," on Plaintiff's record. Tr. 301. On February 15, 2010, Nurse Willis reported that Plaintiff was groomed

and cooperative; that his mood was anxious; that he became frustrated when "dealing with [his] girlfriend"; that his speech was normal; that his impulse control was poor; that his judgment was good; that his thought process was "org"; and that he was "touchy/easily annoyed." Tr. 328. On March 3, 2010, Nurse Willis noted that Plaintiff was "doing well -stable." Tr. 328. On March 15, 2010, Nurse Willis reported that Plaintiff had suicidal thoughts, poor impulse control, and good judgment. Tr. 412. On April 7, 2010, Nurse Willis noted that Plaintiff was "struggling [with] bipolar." Tr. 412. On April 12, 2010, Nurse Willis reported that Plaintiff had no suicidal ideation or thought; that he said he felt like he was "going in [a] hundred directions"; that Plaintiff said he was "really stressed, court's Thursday"; that Plaintiff was groomed and cooperative; that he was irritable; that he had low mood and was anxious; that his judgment was good; that he had no suicidal ideas or thoughts; and that Plaintiff said he had not been sleeping. Tr. 413. On April 21, 2010, Nurse Willis reported that Plaintiff had "high stress." Tr. 413.

An April 26, 2010 Annual Psychosocial Clinical Assessment states that Plaintiff said that he thought "of ways to kill himself because his girlfriend [was] frustrating and because of his other problems, including stress about not being able to see his kids and not having enough money for child support." Tr. 415. Records of this date also state that Plaintiff was working on getting disability income; that Plaintiff's behavior was "somewhat withdrawn and negative"; that he was oriented times three; that his motor activity was normal; that Plaintiff had a GAF of 45; that Plaintiff's stressors were moderate and included limited resources, financial stress, and relationship problems; and that Plaintiff said he "*would be fine if [he] had money*"; that Plaintiff said he dreamed of suicide "but stated that he was not at the point where he would actually follow through with this"; and that it was *recommended that he find a gym* which could help improve his mental health and feel physically well, "in addition to being an outlet to meet some new people"; and that it was recommended that he

discuss other activities with his CSW with which he could become involved, such as volunteering, to "help him get out of the house." Tr. 414-17. On May 24, 2010, Nurse Willis reported that Plaintiff said he was *"doing pretty good"* and that he had not had "a lot of depression feelings"; that his goals were appropriate; that he had no suicidal ideation or thought; that his *impulse control and judgment* were *good;* that he was *alert;* and that his *depression and anxiety* were *better.* Tr. 422.

On June 2, 2010, Nurse Willis noted that Plaintiff's "med issues [were] better." Tr. 422. On June 7, 2010, Nurse Willis reported that Plaintiff had no suicidal ideation or thought; that his thought was organized; that he was irritable; that his appearance was groomed; that he was self-aware; that his impulse control was poor; that his judgment was good; and that he was alert. Tr. 423. On June 28, 2010, Nurse Willis reported that Plaintiff said he had racing thoughts and was "more distracted"; that Plaintiff's impulse control and judgment were good; that his process of thinking was "org"; that he was alert; and that he had low mood and anxiety. Tr. 424. On July 19, 2010, Nurse Willis reported that Plaintiff said he had been in jail for two weeks; that the charges that he wrote checks for a closed account were false; that he was not given his medication while in jail; and that he had been denied disability. Nurse Willis also reported on this date that Plaintiff's motor activity was spontaneous; that his mood was irritable/anxious; that his speech was normal; that he was self-aware; that he did not have suicidal ideation or thought; that he impulse control and judgment were good; that his memory was intact; that he was oriented and alert; and that he had low mood and racing thought and was touchy/easily annoyed. Tr. 425.

The first record of Plaintiff's seeking medical care for his alleged physical impairments on or after his alleged onset date is a report, dated April 21, 2009, from Jamie Kauffman, D.O. On this date Plaintiff presented to Dr. Kauffman to establish care and Dr. Kauffman reported that Plaintiff said he had not had a physical in six to seven years; that he had a history of lower back and neck pain

resulting from motor vehicle accidents; and that he had left knee pain "off and on"; that his knee hurt since his junior year in high school and he never had it checked out; that he had right wrist pain, which "comes and goes"; that "a couple of fingers ... bother[ed] him"; that he was seeing Nurse Willis for his bi-polar disorder; and that he did not feel his bipolar disorder was controlled. Dr. Kauffman further reported on April 21, 2009, that physical examination showed that Plaintiff's *left knee* had *no swelling or redness*, had tenderness on medial jointline palpation, and *normal range of motion* on flexion and extension; that Plaintiff's *right wrist/hand* had *no swelling, redness, or eccymosis, restricted range of motion on flexion and extension, tenderness on palpation, normal strength of flexors and extensors, normal grip, normal touch and pain sensations, and no swelling* or redness in the "MCP and IP joints"; that Plaintiff was overweight; that Plaintiff's blood pressure was 148/90;[3] that Plaintiff would be started on medications for hypertension, bipolar disorder, and knee pain and he would have x-rays for pain in his limb; and that Dr. Kauffman's assessment included hypertension, bipolar disorder, knee pain, and pain in limb. Tr. 223-24.

When Plaintiff presented to Dr. Kauffman on May 5, 2009, Dr. Kauffman reported that Plaintiff presented for review of x-ray reports; that he said his "wrist and knee had been bothering him a lot"; that the wrist x-ray showed "congenital shortening of the ulna as compared to the radius, but no fx or internal derangement"; that an x-ray of the knee showed a "possible small effusion"; that examination of Plaintiff's left knee showed "no swelling or redness," tenderness on medial jointline palpation, and normal range of motion on flexion and extension; that Plaintiff's *blood pressure* was

---

[3]     See Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992) (holding that a high blood pressure reading of 170/90 indicates only moderate hypertension); Brown v. Heckler, 767 F.2d 451, 453 (8th Cir. 1985) (holding that blood pressure which measures within the range of 140-180/90-115 is considered mild or moderate, and that hypertension does not qualify as severe where it does not result in damage to the heart, eye, brain or kidney) (citing 20 C.F.R. pt. 404, subpt, P, app. 1, 4.00 C).

*118/78*; and that examination of Plaintiff's *right hand and wrist* showed *no swelling, redness, or eccymosis, restricted range of motion, tenderness on scaphoid bone to palpation, normal strength of flexors and extensors, normal grip, normal touch and pain sensations, and no swelling or redness* in the "MCP and IP joints." Tr. 222. A right wrist MRI report, dated May 9, 2009, states that the MRI showed "[a]bnormal contour and configuration of the triangular fiber cartilage with some peripheral fluid and a somewhat blunted central free edge"; that findings were "suspicious for injury of the triangular fiber cartilage"; and that there was "negative ulnar variance." Tr. 226. A left knee MRI report, dated May 9, 2009, states that the MRI showed a medial meniscal tear and "high-grade partial thickness tear of the infrapatellar tendon laterally." Tr. 227.

Plaintiff had knee surgery on July 1, 2009. When he was examined six days later, on July 6, 2009, it was reported that the "common femoral, superficial femoral, popliteal and posterior tibial vein as well as peroneal veins [were] normal in course and caliber without intraluminal echoes"; that there was "complete effacement of the lumen with mild compressive force"; doppler wave forms showed normal respiratory variation and augmentation of flow on the compression of the calf; and that there was no sonographic evidence of DVT in the left lower extremity. Tr. 278. On July 10, 2009, Plaintiff presented to Samaritan Hospital Emergency Room, for chest pain. Records of this visit state, on review of *Plaintiff's systems* on this visit, that *no abnormalities* were found; that impression was "Gastritis/GERD uncontrolled" and Plaintiff was discharged to home; and that prior to discharge the "pressure [was] totally gone" and he had "no pain." Tr. 255-58. Plaintiff then presented to Dr. Kauffman on July 21, 2009, for follow-up from his emergency room visit. Dr. Kauffman reported on this date that Plaintiff's chest and abdominal pain and improved; that his blood pressure was 126/70; and that his abdomen was normal with no tenderness. Tr. 392. On December 24, 2009, Dr. Kauffman diagnosed Plaintiff with diabetes and noted that metformin had been

prescribed the previous day. Tr. 341-42. When Plaintiff saw Dr. Kauffman on March 25, 2010, he said he had knee pain; that the pain had improved after surgery the prior year; that he re-aggravated the pain when he fell "several weeks ago." Tr. 339.  Dr. Kauffman also reported on this date that Plaintiff said he was symptomatic for hypoglycemia occasionally and that, on examination, Plaintiff's left knee had no swelling or redness, tenderness to palpation, and tender range of motion with "flexion beyond 90"; and that Plaintiff was referred to an orthopedist for knee pain. Tr. 339-40. A March 25, 2010, x-ray of Plaintiff's left knee after a fall showed "mild patellofemoral joint space narrowing," "medical compartment joint space narrowing," "[n]o lytic or ballistic change" and no acute fracture. Tr. 345.  Nurse Willis reported, on May 10, 2010, that Plaintiff had a new procedure on his knees and that he was unable to exercise. Tr. 421.  On May 24, 2010, Nurse Willis noted that Plaintiff's knee was healing. Tr. 422.  Based on the record as a whole, as discussed in detail below, to the extent Nurse Willis opined that Plaintiff was disabled due to his mental conditions, the ALJ did not credit this opinion.  Based on the medical evidence, the ALJ concluded that Plaintiff's complaints of knee and wrist pain were out of proportion to the objective medical evidence and that, although Plaintiff was diagnosed with hypertension and diabetes, there was no evidence of end-organ damage. Tr. 18.The court finds that substantial evidence supports the ALJ's determination that the objective medical records did not support Plaintiff's allegations regarding the severity of his physical and mental conditions.

Second, the ALJ considered that Plaintiff's conditions improved with medication. Tr. 18-20. Indeed, Plaintiff reported on February 21, 2006, that with medication, he was less angry and hostile, had only mild mania, and had no depression. Tr. 363.  As stated above, Dr. Tichenor, reported on February 3, 2009, that Plaintiff said his psychiatric medications were "somewhat effective in controlling his behavior" and that, although Plaintiff was precluded from gainful employment at that

time, appropriate medications would likely improve his functional capability and make him employable. Tr. 204-205. Dr. Kauffman reported, on May 5, 2009, that Plaintiff's blood pressure was better and he had been taking his medication "as ordered"; that Plaintiff did not think his depression had improved on his current medication; and that Nurse Willis increased Plaintiff's medications during an appointment earlier that day. Tr. 221. Nurse Willis reported that Plaintiff said that Depakote did help to stabilize his mood; that she believed that Plaintiff's psychiatric medication "appear[ed] to have helped him"; that Plaintiff did not continue with "psychiatric care after leaving prison and appear[ed] to have gone downhill since then"; and that if he took his medications, attended psychiatric appointments, among other things, he might be eligible for discharge from the "CPRC program in a year's time." Tr. 316, 319, 321. On July 21, 2009, Dr. Kauffman reported that after Plaintiff visited the emergency room for chest and abdominal pain, he was treated with Zantac and his condition improved. Dr. Kauffman also reported on this date that Plaintiff said his bipolar medications were working well. Tr. 391.

Further, in regard to Plaintiff's improving with medication, on August 17, 2009, Nurse Willis reported that Plaintiff was sleeping better with Seroquel. Tr. 309. On September 28, 2009, Nurse Willis reported that Plaintiff said he was a "'completely different person [with] meds & totally different'" and that he had "been pretty good, [he was] taking [his] meds." Tr. 307. On October 21, 2009, Nurse Willis reported that Plaintiff was "better [with] meds." Tr. 306. On November 9, 2009, Nurse Willis reported that Plaintiff's medications were "keeping [him] from blowing up or having a blackout." Tr. 304. When Plaintiff saw Dr. Kauffman on March 25, 2010, he denied adverse affects from his diabetes medication. Tr. 339. Plaintiff reported on April 26, 2010, that when he was off his medication, "'little things people [did] piss[ed] him off'" and he was "'raging out of control'"; that recently, when he had been on his medication, he still got mad and "put his fist through walls"; that

his ways of coping with his symptoms included talking to Nurse Willis; and that he did not experience paranoia when he was on his medications. Tr. 415-16. On May 5, 2010, Nurse Willis reported that "med adj[ustment] [was] helping." Tr. 420. Conditions which can be controlled by treatment are not disabling. See Davidson v. Astrue, 578 F.3d 838, 846 (8th Cir. 2009); Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009); Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (holding that if an impairment can be controlled by treatment, it cannot be considered disabling); Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002); Murphy, 953 F.2d 383, 384 (8th Cir. 1992); Warford v. Bowen, 875 F.2d 671, 673 (8th Cir. 1989) (holding that a medical condition that can be controlled by treatment is not disabling); James for James v. Bowen, 870 F.2d 448, 450 (8th Cir. 1989). The court finds that the ALJ's considering that Plaintiff improved with medication is based on substantial evidence and that it is consistent with the Regulations and case law.

Third, to the extent Plaintiff was stressed or suicidal due to personal issues, including issues with his girlfriend, a court date, and limited financial resources, situational depression is not disabling. See Dunahoo v. Apfel, 241 F.3d 1033, 1039-40 (8th Cir. 2001) (holding that depression was situational and not disabling because it was due to denial of food stamps and workers compensation and because there was no evidence that it resulted in significant functional limitations).

Fourth, the ALJ considered that Plaintiff's daily activities were inconsistent with the limitations he claimed he had. Tr. 20. In this regard, the ALJ considered that Plaintiff said he spent his day lifting weights, playing video games, or listening to music and that Plaintiff testified that he was able to drive, although he could not drive more than thirty minutes. Tr. 17-18. Further, Plaintiff reported on January 16, 2009, that he shopped in stores for food; that he could count change and pay bills; that he read "a lot" and watched television; that he read "well"; and that when he went out he did not need someone to accompany him. Tr. 150-57. Plaintiff reported on April 26, 2010, pursuant

to his Assessment, that he used household appliances safely; that he dressed for the weather and activity; that he independently attended to basic self help needs and took care of his hygiene without prompting or assistance; that he owned a car which he used for transportation; that his girlfriend did the shopping; that his girlfriend or her mother did the cooking; that he had not been doing the "cooking lately"; that he "mainly just use[ed] the microwave"; that he picked "up behind himself - not behind other adults"; that he "picked up behind his daughter"; that he had "been picking up more lately"; that he was currently living with his girlfriend and her mother and "would like to move into his own place but [was] not able to do so financially at [that] time"; that he "would possibly be interested in going back to school for an Associate's degree in economics or business management"; that he enjoyed playing x-box, baseball, and online poker; that he and his CSW had "been looking into finding a gym where he could play basketball, but at this point he [was] not able to afford membership at a bigger gym." Tr. 416-17. Further, the record does reflect that Plaintiff did play basketball and exercise in a gym during the period he alleges he was disabled. Tr. 288, 409, 414, 417. While the undersigned appreciates that a claimant need not be bedridden before he can be determined to be disabled, Plaintiff's daily activities can nonetheless be seen as inconsistent with his subjective complaints of a disabling impairment and may be considered in judging the credibility of complaints. Eichelberger, 390 F.3d at 590 (holding that the ALJ properly considered that the plaintiff watched television, read, drove, and attended church upon concluding that subjective complaints of pain were not credible); Dunahoo, 241 F.3d at 1038; Onstead, 962 F.2d at 805; Murphy v. Sullivan, 953 F.2d 383, 386 (8th Cir. 1992); Benskin, 830 F.2d at 883; Bolton v. Bowen, 814 F.2d 536, 538 (8th Cir. 1987). Indeed, the Eighth Circuit holds that allegations of disabling "pain may be discredited by evidence of daily activities inconsistent with such allegations." Davis v. Apfel, 239 F.3d 962, 967 (8th Cir. 2001) (citing Benskin, 830 F.2d at 883). "Inconsistencies between [a claimant's] subjective

complaints and [his] activities diminish [his] credibility." Goff, 421 F.3d at 792 (citing Riggins v.

Apfel, 177 F.3d 689, 692 (8th Cir. 1999)). See also Haley v. Massanari, 258 F.3d 742, 748 (8th Cir.

2001); Nguyen v. Chater, 75 F.3d 429, 439-41 (8th Cir. 1996) (holding that a claimant's daily

activities, including visiting neighbors, cooking, doing laundry, and attending church, were

incompatible with disabling pain and affirming denial of benefits at the second step of analysis).  The

court finds, therefore, that the ALJ properly considered Plaintiff's daily activities upon choosing to

discredit his complaints of debilitating pain.  The court further finds that substantial evidence supports

the ALJ's decision in this regard.

Fifth, the ALJ considered that Plaintiff did not use an assistive device to ambulate. Tr. 18.

The failure to use an assistive device detracts from a claimant's credibility. See e.g., Gonzales v.

Barnhart, 465 F.3d 890, 895 (8th Cir. 2006).  The court finds that the ALJ's decision in this regard

is supported by substantial evidence and that it is consistent with the Regulations and case law.

In conclusion, the court finds that the ALJ's consideration of Plaintiff's credibility is based

on substantial evidence and consistent with the Regulations and case law.

**B.      Plaintiff's Failure to Meet a Listing and Nurse Willis's Opinion:**

The ALJ found that Plaintiff did not have an impairment that met or equaled any listed

impairment.  Plaintiff contends that the ALJ should have found that he met the listing for Affective

Disorders, Listing 12.04, and that Nurse Willis's opinion supports such a finding.   This Listing

requires a Plaintiff to prove the "[m]edically documented persistence, either continuous or

intermittent" of an affective disorder such as bipolar syndrome and satisfy either the "paragraph B"

or "paragraph C" criteria. See 20 C.F.R. pt. 404, subpt. P, app. 1.  To satisfy the paragraph B criteria,

a claimant must show that he has marked difficulties in two of the four functional areas, or marked

difficulties in one functional area and repeated episodes of decompensation of extended duration. Id.

The ALJ specifically addressed the four functional areas of the paragraph B criteria, and found that Plaintiff had mild limitations with respect to activities of daily living, moderate limitations in social functioning, moderate limitations in concentration, persistence, and pace, and no episodes of deterioration or decompensation. Tr. 14. In regard to Plaintiff's social functioning, the record reflects that he had a long term relationship with his girlfriend. Also, Plaintiff reported, on April 6, 2009, that his strengths included his being "easy to get along with." Tr. 315. In activities of daily living, as discussed above, Plaintiff was able to care for his personal needs, shop, manage his finances, read, and watch television. Tr. 14, 150-57, 318. See Eichelberger, 390 F.3d at 590; Danahoo, 241 F.3d at 1038. As also discussed above in regard to Plaintiff's daily activities, Plaintiff played basketball and exercised in a gym three times a week during the period he alleges he was disabled. Tr. 288, 409, 414, 417. Additionally, Plaintiff repeatedly stated that he had problems with mood swings and irritability. Tr. 39, 155. The ALJ noted, however, that the record did not reflect that Plaintiff had ever lost a job due to mood swings. In any case, the record reflects that when Plaintiff was compliant with his medications he was less hostile and angry, he was better, and his mood was stabilized. See Davidson, 578 F.3d at 846; Medhaug, 578 F.3d at 813. In regard to Plaintiff's moderate limitations in concentration, persistence, and pace, the record reflects that he could read, watch television, play x-box, pay bills, and handle a savings account. Tr. 150-54, 319. As found by the ALJ, the record does not reflect that Plaintiff had episodes of deterioration or decompensation. Tr. 14.

To the extent that Plaintiff contends that he met the requirements of Listing 12.04 because he had marked limitations in activities of daily living, social functioning, and concentration, persistence, and pace, the court has found above that the ALJ's discrediting Plaintiff's allegations in regard to these areas is based on substantial evidence. To the extent that Plaintiff contends that Nurse Willis's records establish that he met Listing 12.04, as considered by the ALJ, Nurse Willis is not an

acceptable medical source whose opinion is entitled to controlling weight. Tr. 19-20. See Lacroix, 465 F.3d at 885-86 (citing 20 C.F.R. §§ 404.1502 and 416.902). Moreover, as fully set forth in regard to Plaintiff's credibility, Nurse Willis's opinion is not supported by the record, including her own treatment notes and reports from other sources. See Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) (citing Matthews v. Bowen, 879 F.2d 422, 424 (8th Cir. 1989) (holding that opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data); 20 C.F.R. § 404.1527(d)(3) (providing that more weight will be given to an opinion when a medical source presents relevant evidence, such as medical signs, in support of his or her opinion). See also Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (holding that a treating physician's opinion is given controlling weight "if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence"). In any case, consistent with the Regulations, the ALJ did consider Nurse Willis's opinion upon determining that Plaintiff was not credible and upon considering Plaintiff's limitations as to the paragraph B criteria. See Lacroix, 465 F.3d at 887(holding that nurse practitioners are "other" medical sources who may present evidence of the severity of the claimant's impairment and the effect of the impairment on the claimant's ability to work) (citing §§ 404.1513(d)(1), 416.913(d)(1)). As such, the court finds that the ALJ gave proper weight to Nurse Willis's opinion.

To the extent Plaintiff contends that his GAF scores of 45 and 55 establish that me met the requirements of Listing 12.04, Plaintiff's argument is without merit. First, it was Nurse Willis who assigned Plaintiff a GAF of 45, and, as discussed above, she is not an acceptable medical source. On

the other hand, Dr. Tichenor, who is an acceptable medical source, opined that Plaintiff had a GAF of 55, which indicates only moderate symptoms. See <u>Lacroix</u>, 465 F.3d at 885-86 ("[O]nly 'acceptable medical sources' can be considered treating sources, as defined in 20 C.F.R. 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight."). Moreover, a GAF score is not determinative of whether a claimant is disabled. <u>See</u> n. 2, above. In any case, when Nurse Willis noted that Plaintiff's GAF was 45 and when Dr. Tichenor reported that Plaintiff's GAF was 55, each of these sources reported that Plaintiff was not compliant with his medications. Tr. 204-205, 316-17. Significantly, it was subsequently reported that Plaintiff improved with medication compliance and adjustment. Tr. 420, 422-24.

To the extent Plaintiff contends that the findings of Charles McDonald, Ph.D., in a Mental RFC Assessment, reflect that Plaintiff had marked limitations in the ability to interact with the general public, Dr. McDonald completed this RFC Assessment on May 17, 2006, pursuant to Plaintiff's prior application for benefits and about two years prior to Plaintiff's alleged onset date. Tr. 266-68. Thus, Dr. McDonald's opinion does not address Plaintiff's condition during the relevant period.

The court finds that the ALJ did not make his own medical conclusions, as asserted by Plaintiff. Rather, the ALJ considered the medical records in detail and reached his conclusions after considering the opinions of all sources of record. To the extent the ALJ may not have addressed every detail of every report or record, an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered. See <u>Moore ex rel. Moore v. Barnhart</u>, 413 F.3d 718, 721 n.3 (8th Cir. 2005) ("The fact that the ALJ's decision does not specifically mention the [particular listing] does not affect our review."); <u>Montgomery v. Chater</u>, 69 F.3d 273, 275 (8th Cir. 1995). In conclusion, the court finds that the ALJ's determination that Plaintiff did not meet Listing 12.04 is based on substantial evidence and consistent with the Regulations and case law.

**C.    Plaintiff's Past Relevant Work:**

Plaintiff contends that the ALJ erred in finding that he could perform his past relevant work because she did not conduct an adequate comparison of the mental impairments of his prior work with his RFC.

The ALJ found that Plaintiff had the RFC to perform medium work and that he could occasionally climb, kneel, crouch, and crawl; that he was moderately limited in his ability to understand, remember, and carry-out detailed instructions; that he was moderately limited in his ability to maintain attention and concentration for extended periods; that he was moderately limited in his ability to work in coordination or proximity to others without being distracted by them; that he was moderately limited in his ability to interact appropriately with the general public; that he was moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors; that he was moderately limited in his ability to get along with co-workers or peers without distracting them or exhibiting behavior extremes; that he was moderately limited in his ability to respond appropriately to changes in work settings; that he retained to ability to understand, remember, and carry -out simple instructions; that he could maintain adequate attendance and sustain an ordinary routine without special supervision; that he could interact adequately with peers and supervisors in a work setting that had minimal demands for social interaction; that he could adapt to minor changes in a work setting; that he had mild restrictions with activities of daily living; moderate difficulties with maintaining social functioning; that he had moderate difficulties in maintaining concentration, persistence, or pace; and that he had no episodes of decompenstion. Tr. 15. The Regulations define RFC as "what [the claimant] can do" despite his or her "physical or mental limitations." 20 C.F.R. § 404.1545(a). The court finds that the ALJ's RFC determination is based on substantial evidence.

The ALJ was required to evaluate whether Plaintiff could perform his past relevant work in view of his RFC. See Wagner v. Astrue, 499 F.3d 842, 853 (8th Cir. 2007). If a claimant is found to be able to perform the duties of his past relevant work, then he is considered not disabled and, therefore, ineligible for benefits. Bowen v. City of New York, 476 U.S. 467, 471 (1986); Martin v. Sullivan, 901 F.2d 650, 652 (8th Cir. 1990). Additionally, 20 C.F.R. § 404.1560(b) states, in relevant part, regarding past relevant work, that a VE can consider how a claimant actually performed his past relevant work or how it is generally performed in the economy.

Based on the testimony of a VE, the ALJ determined that Plaintiff could perform his past relevant work. Tr. 21, 49-52. The ALJ posed a hypothetical to the VE which included the RFC set forth above. An ALJ posing a hypothetical to a VE is not required to include all of a claimant's limitations, but only those which he finds credible. Martise v. Astrue, 641 F.3d 909, 927(8th Cir. 2011) ("The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole."); Guilliams, 393 F.3d at 804 (holding that a proper hypothetical sets forth impairments supported by substantial evidence and accepted as true by the ALJ); Gilbert v. Apfel, 175 F.3d 602, 604 (8th Cir. 1999) ("In posing hypothetical questions to a vocational expert, an ALJ must include all impairments he finds supported by the administrative record."); Sobania v. Sec'y of Health, Educ. & Human Servs., 879 F.2d 441, 445 (8th Cir. 1989); Rautio, 862 F.2d at 180.

In response to the hypothetical which included Plaintiff's RFC and described a person of Plaintiff's age, educational background, and work experience, the VE testified that such a person would be capable of performing Plaintiff's past relevant work as a bay attendant as actually and generally performed, as a warehouse laborer as generally performed, and as an automobile detailer as actually and generally performed. Tr. 21, 50-52. Where a hypothetical question precisely sets forth

all of the claimant's physical and mental impairments, a VE's testimony constitutes substantial evidence supporting the ALJ's decision. <u>Martise</u>, 641 F.3d at 927 ("Based on our previous conclusion ... that 'the ALJ's findings of [the claimant's] RFC are supported by substantial evidence,' we hold that '[t]he hypothetical question was therefore proper, and the VE's answer constituted substantial evidence supporting the Commissioner's denial of benefits.'") (quoting <u>Lacroix</u>, 465 F.3d at 889; <u>Robson v. Astrue</u>, 526 F.3d 389, 392 (8th Cir. 2008) (holding that a VE's testimony is substantial evidence when it is based on an accurately phrased hypothetical capturing the concrete consequences of a claimant's limitations); <u>Wingert v. Bowen</u>, 894 F.2d 296, 298 (8th Cir. 1990). As such, the court finds that the ALJ properly relied on the testimony of the VE that Plaintiff could perform his past relevant work.

Alternatively, as considered by the ALJ, the VE testified that Plaintiff was capable of performing other jobs which existed in significant numbers in the national economy, including factory helper, housekeeper, and assembler. Tr. 21-22, 52. The VE's testimony in this regard constitutes substantial evidence. <u>See</u> <u>Martise</u>, 641 F.3d at 927. Thus, even if Plaintiff was precluded from performing his past relevant work, he was capable of performing other work. <u>See</u> 20 C.F.R. § 404.1560(b)(3) and (c). As such, the ALJ properly found that Plaintiff was not disabled through the date of the decision and the ALJ's determination, in this regard, is based on substantial evidence.

## IV.
## CONCLUSION

For the reasons set forth above, the court finds that substantial evidence on the record as a whole supports Commissioner's decision that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the relief sought by Plaintiff in his Complaint and Brief in Support of Complaint be **DENIED**; Docs. 1, 13,

**IT IS FURTHER RECOMMENDED** that a separate Judgment, incorporating this Report and Recommendation, be entered in favor of Defendant and against Plaintiff.

The parties are advised that they have fourteen (14) days in which to file written objections to these recommendations pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this 19th day of March, 2012.